## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr><td>

**JOSE B.R.,**

                *Petitioner*,

    **v.**

**JOHN TSOUKARIS, et al.,**

             *Respondents.*

</td><td>

Civil Action No. 20-3347 (MCA)

**OPINION**

</td></tr>
</table>

**ARLEO, UNITED STATES DISTRICT JUDGE**

Petitioner Jose B.R. ("Petitioner" or "Jose") is citizen of Mexico who has lived in the United States since he was eight years old.  He is currently in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") and detained at Essex County Correctional Facility ("ECCF" or "the Facility") in New Jersey.  On March 27, 2020, Petitioner filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.  On March 31, Petitioner filed a Motion for a Temporary Restraining Order and Preliminary Injunction under Federal Rule of Civil Procedure 65, requesting the Court order his immediate release from detention pursuant to *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986).  ECF No 4.  Respondents oppose the Motion.  ECF No. 9.  Having reviewed the parties' detailed submissions, examined the applicable law, directed the parties to provide supplemental information, and held an oral conference on the matter, the Court grants Petitioner's Motion for a Preliminary Injunction and directs Respondents to immediately release Petitioner subject to the conditions set forth below.

## I.      FACTUAL BACKGROUND

### A.      Petitioner's Removal Proceedings

Petitioner Jose B.R. is a twenty-four-year old citizen of Mexico, who has lived in New Jersey since he was eight years old.  *See* Ex. A, BIA Br at 2.  Petitioner is the oldest of four siblings; his younger siblings are all U.S. Citizens.  *Id.*  Around middle school, Jose was placed in special education classes.  *Id.*  He was also physically abused by his stepfather, who on one occasion hit Jose on the head with a piece of metal from the stove.  *Id.*  When Jose was a teenager, for over a year, he suffered physical abuse by a partner, requiring hospitalization.  Jose reported the abuse in family court, which granted a restraining order.  *Id.* at 3.  During his teenage years, Jose began to develop symptoms of mental illness such as visual and auditory hallucinations.  *Id.*

On July 25, 2013, shortly after Jose turned eighteen years old, DHS initiated removal proceedings against him.  *Id.* On August 14, 2013, Jose conceded removability under 8 U.S.C. § 1182(a)(6)(A)(i), for entering the U.S. without inspection.  *Id.* at 4.  He filed an Application for Asylum, Withholding of Removal, and Protection under the Convention Against Torture ("CAT") with the Newark Immigration Court on December 17, 2014.  *Id.*

Jose was convicted in Ocean County on February 17, 2017 under N.J.S.A. § 2C:18-2A(1), for burglary in the third degree, and under § 2C:20-3A, for theft by unlawful taking in the third degree. His removal proceedings were administratively closed while he served the criminal sentence at Ocean County Jail.  *See* BIA Br. at 4.  He was transferred to ICE custody on October 30, 2018.  *Id.*  In December 2018, DHS moved to recalendar his removal proceedings, filing an

additional charge of removability pursuant to 8 U.S.C. § 1182(a)(2)(A)(i)(1) for conviction of a crime involving moral turpitude. *Id.*

Four different immigration judges subsequently presided over Jose's removal proceedings. *Id.* On December 20, 2018, Jose's immigration counsel asked immigration judge Brandon Hart for a continuance so that Jose could be psychologically evaluated to determine his mental competency. *Id.* On February 19, 2019, Dr. Joy Choi, M.D., a licensed psychiatrist, conducted a psychological evaluation of Jose. *Id.*; *see also* Ex. C, Dr. Choi February 2019 Evaluation. At the next hearing, on February 26, 2019, his counsel presented the court with Dr. Choi's evaluation and requested a hearing pursuant to *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011), to determine the appropriate safeguards given counsel's concerns related to Jose's competency. Pet. at ¶ 22.

The *M-A-M-* hearing, initially scheduled for May 14, 2019, was adjourned because ICE failed to produce Jose. *Id.* at ¶ 23. On June 12, 2019, after holding the *M-A-M-* hearing, Immigration Judge Mirlande Tadal found that Jose was competent to proceed with his case, but stated that she would have appointed him counsel if he had been unrepresented. *See* BIA Br. at 4.

On September 16, 2019, Jose appeared over video teleconference ("VTC") at the Newark Immigration Court for his individual hearing. *Id.* Prior to the hearing, Jose's counsel filed a request to produce him in-person for the hearing, which Immigration Judge Tamar Wilson denied. However, after reviewing the record of Jose's competency hearing during the September 16 hearing, Immigration Judge Tamar Wilson *sua sponte* adjourned the individual hearing so that Jose could be produced to appear in-person at the court. *Id.* at 5. On October 9, 2019, Jose appeared at the Newark Immigration Court in-person for an individual hearing. *Id.* On October 30, 2019, Immigration Judge Carrie Johnson ruled that Jose was ineligible for asylum and statutory withholding of removal, and denied his applications for withholding and deferral of removal under

CAT.  *Id.*  Jose timely appealed the decision to the Board of Immigration Appeals ("BIA").  Pet. ¶ 26.

Before the BIA, Petitioner contends that the immigration judge's decision is riddled with legal errors requiring remand.  Petitioner's BIA brief identifies numerous substantive errors in the immigration judge's decision, such as the procedurally defective and legally incorrect determination of competency, *see* BIA Br. at 8-15; flawed analysis of Jose's eligibility for asylum and withholding of removal in contravention of BIA and Third Circuit precedent, *id.* at 15-21; and factual and legal errors in determining the likelihood that Jose would suffer persecution and torture if he were deported, *id.* at 21-44.  Petitioner contends that should the BIA remand proceedings to the immigration court to correct its numerous legal errors and conduct additional factfinding, Petitioner's detention under § 1226(c) will continue for many more months.  *See* Pet. ¶ 27.

## B.    Petitioner's Declining Mental Health in Immigration Detention

Petitioner has been detained by ICE in connection with his removal proceedings since October 30, 2018, and he has provided the expert opinion of Dr. Choi to support his claim that his mental health has declined significantly throughout the course of his detention.  At the time of February 19, 2019 evaluation by Dr. Choi, *see* Ex. C, Dr. Choi February 2019 Evaluation, Jose's psychiatric symptoms included feeling sad and exhausted, having low energy, paranoia, and visual hallucinations, and complaints of memory loss.  *Id.* ¶¶ 25-29.  He was oriented to person, place, and time, and his ability to think clearly and logically appeared initially within normal limits.  *Id.* ¶ 30.  However, "as the interview progressed and about an hour passed, his thoughts began to derail . . . he began to illogically link unrelated topics."  *Id.* Dr. Choi opined that Jose's symptoms were consistent with psychosis, and that it is likely Jose suffered from Schizoaffective Disorder or Major Depressive Disorder with Psychotic Features.  *Id.* ¶¶ 32, 34.

Dr. Choi returned to ECCF to evaluate Jose on February 22, 2020, after he had been detained an additional year in Respondent's custody.  *See* Ex. B, Dr. Choi February 2020 Evaluation, ¶ 3.  Dr. Choi also reviewed Jose's medical records from October 2018 to January 2020.  *Id.* ¶ 11.  Dr. Choi noted "significantly worsened symptoms of psychosis," and observed that Jose "showed disorganized thinking from the beginning of the interview."  *Id.* ¶ 12.  During the interview, he provided Dr. Choi with a written paragraph that was "extremely disorganized in content, jumping from topic to topic" with most sentences being "nonsensical in . . . content."  *Id.*

Unlike at the previous interview, Jose was no longer able to clearly state the timeline of his incarceration.  *Id.* ¶ 17.  He also had difficulty identifying the name of the jail at which he was detained.  *Id.* ¶ 19. During this assessment, he appeared very anxious, made intense eye contact, would inappropriately laugh or smile, and was dressed oddly with a sweater worn inside out.  *Id.* ¶¶ 19, 21.  Dr. Choi found, "[h]is ability to communicate his thoughts logically was severely impaired.  He jumped from unrelated topic to topic, making it very difficult to follow his thought process.  As a result, it was very difficult to understand what [Jose] was trying to convey."  *Id.* ¶ 20.

Dr. Choi has evaluated the progression of Jose's mental illness since February 2019, at which time Jose exhibited mild signs of a psychotic illness such as schizophrenia.  *Id.* ¶ 24.  After a year in detention, his symptoms of psychosis have significantly worsened "to the point of impairing his ability to have a meaningful conversation . . . during the interview."  *Id.* ¶ 25.  Dr. Choi opines that the worsening of his symptoms, along with an "inability to engage meaningfully in the real world," are indicative of schizophrenia.  *Id.* ¶ 30. 33.  She also opines that individuals with schizophrenia are prone to exacerbation of symptoms when under stress.  *Id.* ¶ 33.  After

discussing numerous indicators that Jose is exhibiting signs of stress, Dr. Choi concluded that she "strongly suspect[s] that being detained is contributing to worsening of his symptoms." *Id.*

### C.    The COVID-19 Health Crisis

Petitioner's deteriorating mental health in immigration detention is occurring in the midst of a global health crisis.  On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[1]  Around that time, the United States had reported only approximately 1,000 cases of COVID-19.[2]  Today, that number has since risen to over 1.3 million, and the virus has taken 82,161 lives nationally.[3]  New York and New Jersey have the greatest number of infections and deaths in the nation, and as of May 12, 2020, New Jersey reported a total of 140,743 total cases and 9,508 deaths.[4]  Essex County, where Petitioner is detained, has a total of 16,658 cases and the most deaths of any county in the state, totaling 1,444.[5]

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and from contact with contaminated surfaces.[6]  The most common symptoms

---

[1] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] *Coronavirus Case Total Climbs in New York*, THE NEW YORK TIMES, https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html (last visited May 12, 2020).

[3] *Coronavirus in the U.S.: Latest Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited May 12, 2020).

[4] *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html (last visited May 12, 2020).

[5] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited May 12, 2020).

[6] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 12, 2020).

of COVID-19 include fever, cough, and shortness of breath, but, notably, one need not present any symptoms to have the virus or be contagious.[7]  Experts still have much to learn about how the virus spreads.  In early April, CDC Director Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated that "a significant number of individuals that are infected actually remain asymptomatic.  That may be as many as 25 percent[,]," which is important because asymptomatic individuals contribute to the transmission of the virus.[8]  Furthermore, those who become symptomatic can likely transmit the virus up to 48 hours before they show symptoms.  These asymptomatic transmitters and individuals who are transmitting the virus before they become symptomatic help explain how rapidly the virus can spread.[9]

There is presently no vaccine to prevent COVID-19 infections.[10]  The CDC and health experts thus emphasize the importance of social isolation or "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch" surfaces, and wearing cloth face covering to curtail the spread of the virus.[11]  Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[12]

---

[7] *Id.*; Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 13, 2020).

[8] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us (last visited May 14, 2020).

[9] *Id.*  The CDC also states in its guidance that "[s]ome recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms."  Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 13, 2020).

[10] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited May 12, 2020).

[11] *Id.*

[12] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 13, 2020).

In truth, avoiding exposure to the virus is nearly impossible in carceral settings such as ECCF.  In its guidance for addressing COVID-19 in correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[13] Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult.

Certain individuals are also at higher risk for severe illness or death if they contract COVID-19.  Among them are persons who are "older," are immunocompromised, or who have underlying health issues like asthma, chronic lung disease, HIV, heart conditions, diabetes, chronic kidney disease, and liver disease.[14]

For complex reasons, individuals with serious mental illness are also particularly vulnerable to infectious diseases,[15] and the public health strategies for preventing and slowing the

---

[13]  CDC  March  2020  Interim  Guidance  ("CDC  Interim  Guidance")  at  2,  available  at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (last  visited  May  13, 2020).

[14]  Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 25, 2020).

[15]  *See* World Health Org., MANAGEMENT OF PHYSICAL HEALTH CONDITIONS IN ADULTS WITH SEVERE MENTAL DISORDERS  38  (Nov.  7,  2018),  https://apps.who.int/iris/bitstream/handle/10665/275718/9789241550383-eng.pdf?ua=1 ("People with [serious mental disorders] are at greater risk than the general population for exposure to infectious diseases."); Hao Yao, et al., *Patients With Mental Health Disorders in the COVID-19 Epidemic*, 7 THE LANCET  E21,  E21  (Apr.  2020),  https://www.thelancet.com/pdfs/journals/lanpsy/PIIS2215-0366(20)30090-0.pdf ("When epidemics arise, people with mental health disorders are generally more susceptible to infections . . . ."); Stanley D. Rosenberg, et al., ASSESSING THE STIRR MODEL OF BEST PRACTICES FOR BLOOD-BORNE INFECTIONS IN CLIENTS  WITH  SEVERE  MENTAL  ILLNESS,  61  PSYCHIATRIC  SERVS.  885,  885  (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3632357/pdf/nihms443299.pdf  ("[C]o-infection  is  markedly elevated for persons with severe mental illness, further increasing morbidity and mortality."); Laura M. Maruschak, et al., PANDEMIC INFLUENZA AND JAIL FACILITIES AND POPULATIONS, 99 AM. J. PUB. HEALTH 339, 342 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4504367/pdf/AJPH.2009.175174.pdf ("Inmates with mental illness pose additional challenges for pandemic planning").

spread of COVID-19, such as social distancing, "may be less effective for certain marginalized groups, notably those with schizophrenia and related disorders."[16]  As explained by one expert,

> [f]eatures of these disorders, such as delusions, hallucinations, disorganized behavior, cognitive impairment, and poor insight, and sociodemographic characteristics, including living in congregate housing and homelessness, may put these individuals at higher risk of becoming infected with COVID-19. Furthermore, people living with schizophrenia are at greater risk for adverse outcomes, including death, because compared with the general population, they typically have poorer physical health, greater socioeconomic disadvantage, are more socially disconnected, and experience pervasive stigma and discrimination.[17]

Thus, in addition to greater susceptibility to infection, treatment may be "more challenging and potentially less effective" in this population, and as a consequence, once they contract a disease, seriously mentally ill individuals face "a 4- to 8-fold risk of death due to infection compared to the general population."[18]  For these reasons, mental- and public-health experts have already begun to sound the alarm about the increased risk that COVID-19 poses to those with serious mental illness.[19]

### D. CDC Guidance for Correctional Facilities and ECCF Protocols for Addressing COVID-19

Warden Ortiz indicates that ECCF has established protocols to address COVID-19. Declaration of Alfaro Ortiz ("Ortiz Decl."), ECF No. 9.2.  ECCF has changed its intake procedures but has not stopped accepting new inmates or detainees.  *Id* ¶¶ 8;15.R.  At intake, a nurse checks new detainees' temperatures and screens their travel and medical histories.  *Id* ¶¶ 8;15.R.  New

---

[16] Nicole Kozloff, et al., *The COVID-19 Global Pandemic: Implications for People With Schizophrenia and Related Disorders*, Schizophrenia Bulletin, https://academic.oup.com/schizophreniabulletin/advance-article/doi/10.1093/schbul/sbaa051/5826166 (last visited May 13, 2020).

[17] *Id.* (citation omitted).

[18] Hao Yao, et al., *supra* n.15, at E21.

[19] *See generally*, Hao Yao, et al., *supra* n.15, at E21; Kozloff, et al., *supra* n.16 at 1-2.

inmates and detainees entering the Facility are to be quarantined for fourteen days before they are assigned to a housing unit, and the Facility's policy requires their temperatures to be taken twice daily. *Id.* ¶ 16 E.ii. All corrections officers, civilians, and outside vendors are subject to health screening before entering the Facility, and anyone who exhibits signs of COVID-19 are denied entry. *Id.* ¶ 15.P.

The Facility has suspended all classes and religious services conducted by volunteers or part-time workers, outside work programs, and social visitations. *Id.* ¶¶ 15.A, 15.L, 15.K, 16.D. Only "window" visits, telephone calls, and video conferencing with attorneys are permitted, and detainees and inmates are separated from visitors by a glass partition. *Id.* ¶¶ 15.N, 16.G, 16.J. Inmates and detainees may use video conferencing to appear before courts. *See id.* ¶ 16.E.v. To ensure only lawyers, ECCF staff, and Newark City Buses enter and exit the grounds, ECCF assigned an officer at the Facility's visitor entrance. *Id.* ¶ 16.E.i.

ECCF houses ICE detainees and inmates in separate buildings. *Id.* ¶ 2. The cells in the buildings have two beds each that are set up as bunk beds. *Id.* ¶ 6. There are bunks around the perimeter of each dorm, and in the center, there is a seating area and recreation yard. *Id.* The housing units are equipped with air circulation systems that circulate fresh air throughout the day. *Id.* ¶ 13. With respect to social distancing and cleaning within the Facility, ECCF has "modified inmate and detainee recreation groups to limit close interaction with other inmates and detainees [and] [r]educed the number of inmates having recreation at the same time by one half to foster social distancing." *Id.* ¶16.E.iii. Staff sanitizes the housing units at least three times per day and the kitchen every hour. *Id.* ¶¶ 15.M., 15.I. Inmates and detainees eat their meals in their pods, where they are provided, or in passive recreation areas. *Id.* ¶ 15.J.

As for personal protective equipment ("PPE") and other supplies, the Facility has received 1,008 Tyvek suits, 1,200 N95 masks, and 29,900 blue surgical masks. *Id.* ¶ 16.H. Warden Ortiz indicates that ECFF has "a six-month inventory of supplies" for "all needed items," *id.* ¶ 15, but does not identify what those "needed" items are. The Facility has also acquired fifty COVID-19 testing kits. *Id.* ¶ 16.A.

ECCF has a physician who is on-site sixteen hours each day and on-call on a twenty-four-hour basis for emergencies. *Id.* ¶ 9. Detainees and inmates are able to make daily sick calls to on-site medical staff, who is available 24/7, as needed. *Id.* ¶¶ 9, 17. Inmates or detainees who may suffer from underlying health conditions are to be monitored daily and removed from the rest of the population "should the need arise." *Id.* ¶ 15.F. It is not clear how the Facility determines when an inmate or detainee needs to be removed from the general population.

According to protocol, those who complain of illness are to be immediately evaluated by medical staff and those who exhibits signs or symptoms of COVID-19, including respiratory illness, are to be provided a surgical mask. *Id.* ¶ 17. "Mildly symptomatic detainees" are transferred to a quarantine area where they remain for fourteen days.[20] *Id.* ¶¶ 18-19. Detainees "who require" COVID-19 testing are tested at University Hospital in Newark, New Jersey, although the Facility does not provide how it determines when testing is required beyond stating that "[m]oderate to severely symptomatic detainees are immediately transported to the hospital for medical evaluation." *Id.* ¶ 18. Confirmed COVID-19 cases that do not require hospitalization return to ECCF and be isolated in a cell designated to house individuals who have tested positive for COVID-19. *Id.* Finally, detainees who have had "a known exposure to a confirmed case of COVID-19, but are asymptomatic," are isolated and "cohorted" together, where they remain for

---

[20] As of April 6, 2020, ECCF reports it had a combined total of 85 inmates and detainees in quarantine. Ortiz Decl.

fourteen days.  *Id.* ¶ 20.  Cohorting terminates if no new COVID-19 case develops within that time.  *Id.*

As of April 6, 2020, ECCF identified the following positive cases of COVID-19 among ECCF inmates, detainees, and staff: (a) two ICE detainees; (b) seven inmates; and (c) ten correctional staff members; and (d) one nurse.  *Id.* ¶ 22.  The Facility sent home all staff who were in proximity of those testing positive to self-quarantine for fourteen days.  *Id.*  As of May 11, however, three immigration detainees, eighty-four correctional officers, and four civilian staff have tested positive, and two inmates have died from possible COVID19 complications.[21]

### E.    Petitioner's Experiences at ECCF

The experiences of Petitioner and other detainees at ECCF, while not entirely inconsistent with Warden Ortiz's sworn Declaration, highlight the gaps in the Facility's protocols.  At ECCF, Petitioner "shares a small room with another person during all hours that he is confined to his cell," and when he is allowed out, he comingles and shares facilities with many dozens of other detainees. Declaration of Rebecca Wyss ("Wyss Decl.") at ¶¶ 7-8, ECF No. 11.1.  Petitioner also shares a bathroom, which has about four showers, with every other detained person in the pod.  *Id.* ¶ 8. Due to the dormitory style of the pods at ECCF, up to 48 men sleep in the same room in beds just 18 inches apart.  *See* Declaration of Olivia Kaplan ("Kaplan Decl.") ¶ 5, ECF No. 11.5; ECF No. 9.2 ¶ 6.  Petitioner reports that phones and tablets, too, are shared between everyone in the pod. Wyss Decl. ¶ 8. When detainees are out of their cells, they are all together in one open space, and recreation space, eating space, and leisure space are all shared between all detainees in the pod. *Id.*

---

[21] *See Outrage In New Jersey Following The First Known Covid19-related Death Of An Immigrant Detainee,* InsiderNJ.com (May 11, 2020), https://www.insidernj.com/press-release/outrage-new-jersey-following-first-known-covid19-related-death-immigrant-detainee/.

In early April, Petitioner informed Ms. Wyss, his immigration attorney, that his cellmate at ECCF became ill and had been taken into quarantine; his cellmate had been coughing, and Petitioner had tried to protect himself from germs by drawing a blanket over his head. *Id.* ¶ 7. Petitioner acknowledges that ECCF staff regularly remove symptomatic detainees from their living quarters, Declaration of Jordan Weiner ("Weiner Decl.") ¶10, ECF No. 11.3, but this does little to protect the detainees who remain, since COVID-19 is contagious even before the onset of observable symptoms. Indeed, Dr. Anicette recently told stakeholders that the minimum steps necessary to attempt containment, like social distancing and quarantine, are impossible in the dorms. Declaration of Laura Rodriguez ("Rodriguez Decl.") ¶ 9, ECF No. 11.2.

The situation in ECCF's quarantine area is even bleaker than in the dorms.[22] Many detainees who fall ill are so afraid of quarantine conditions that they do not report their symptoms. Kaplan Decl. ¶5. The quarantine cells are so cold that symptoms worsen, and detainees report being denied access to water, soap, and telephones. *Id.*; *see also* Declaration of Frances Hartmann ("Hartmann Decl.") ¶ 6, ECF No. 11.4; Weiner Decl. ¶ 7. Quarantined detainees are allowed out of their cells for just one hour every three days, the only time in which they shower and make phone calls. Weiner Decl. ¶ 8; Rodriguez Decl. ¶6.

---

[22] The Court also notes that the Office of the Inspector General ("OIG") of DHS has documented safety issues at ECCF prior to the COVID-19 outbreak. In February 2019, OIG "identified serious issues relating to safety, security, and environmental health" at ECCF, including "serious concerns about the facility's ability to handle security issues"; "concerns about food, particularly meat, which was raw, spoiled, or expired"; and "leaking ceilings in detainee living areas, showers laced with mold and peeling paint, and dilapidated beds." Office of the Inspector Gen., Dep't of Homeland Sec., Issues Requiring Action at the Essex County Correctional Facility in Newark, New Jersey (Feb. 13, 2019), at 2–4, 7. "Based on the substandard food safety and sanitation practices we observed," the OIG concluded, "ICE cannot ensure detainee health at the Essex Facility." *Id.* at 6. The OIG conducted a follow up visit to ECCF in June 2019, and noted that the food safety situation remained "egregious" at ECCF, and that "mold permeated all walls in the bathroom area, including ceilings, vents, mirrors, and shower stalls" which "present health risks." Office of the Inspector Gen., Dep't of Homeland Sec., Concerns about ICE Treatment and Care at Four Detention Facilities (June 3, 2019), at 4, 8.

Ms. Wyss also reports that she has been unable to contact Jose using the video-teleconferencing system launched on April 1, 2020.  Wyss Decl. ¶ 4.  An ECCF representative informed Petitioner's counsel that attorneys can only access the video- teleconferencing system from the lobby of the jail, that the service is extremely limited in availability, and the conference must be booked in advance.  *Id.*  All the attorneys representing the 1700 detainees/inmates are on a first-call-first-served system, and the appointments are offered in only 20-minute increments from 9 a.m. to 3 p.m., Monday to Friday, with room for only one attorney at a time to meet with clients.  *Id.*

### F.     Effect of the COVID-19 Pandemic on the Elizabeth Immigration Court

Ms. Wyss also reports that there have been intermittent court closures at Elizabeth Immigration Court, misinformation about closures, and a lack of judges available to hear cases even when the Court is open.  On March 30, 2020, Petitioner's counsel was informed that Elizabeth Immigration Court was likely shutting down for two weeks, but on April 2, 2020, she learned that the court would reopen on April 3, 2020, but would operate without judges until April 6, 2020.  *Id.* at ¶¶ 10-12.  Ms. Wyss did not receive an Executive Office for Immigration Review ("EOIR") update reporting the reopening of the court.  *Id.*  She later learned that the Elizabeth Immigration Court reopened with an immigration judge who normally sits in New York, appearing remotely, that no detainees from Hudson County were being produced, and that a pro se litigant, a monolingual Spanish speaker, had been asked to waive interpretation.  *Id.* at ¶ 12.

On April 6, 2020, Ms. Wyss appeared by telephone for a hearing at the Elizabeth Immigration Court where a single immigration judge was present despite the fact that hearings had been scheduled for two judges that day.  *Id.* ¶ 13.  Normally, three judges, each with a full docket of cases, sit at the Elizabeth Immigration Court.  *Id.*  The judge who was present informed Ms.

Wyss that she had not reviewed the motion Ms. Wyss had submitted the previous week, and that no one at the court had yet begun reviewing motions submitted the week prior.  *Id*.  Since that time, the court has not provided updates as to how many judges will be hearing cases, which judges will be sitting on which days, when hearings will be rescheduled, or other notifications, and Ms. Wyss receives information about the court's operations from other attorneys, not the court or the EOIR website.  *Id.*

On April 8, 2020, the Elizabeth Immigration Court closed mid-morning during hearings, and the court remained closed through April 9, 2020, with no notification about how long it would be closed.  *Id.* ¶ 15.  On April 10, 2020, the court reopened with no judges present.  *Id.*  Ms. Wyss states that "court closures and hearings at Elizabeth Immigration Court have been erratic and opaque" and she "has not received any communication from the court about hearing cancellations for my clients, and based on my conversations, many attorneys are experiencing the same."  *Id.* ¶ 16.

## II.     STANDARDS OF REVIEW

### A.     Preliminary Injunction

Motions for temporary and preliminary injunctive relief are governed by a four-factor test.[23]  The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).  Under the first factor, the movant must show that "[he or she] can win on the merits." *Id.*  This showing must be "significantly better than negligible but not necessarily more likely than

---

[23] The Court considers Petitioner's motion as a request for a preliminary injunction because it will be issued with notice to the adverse party pursuant to Rule 65, and because it seeks to alter, rather than maintain, the status quo.  *See Hope v. Warden York Cty. Prison*, 2020 WL 1922372, at *2-4  (3d Cir. Apr. 21, 2020) (precedential) (addressing jurisdiction only and finding TRO issued by district court to be an appealable injunction).

not." *Id.*  The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief.  *Id.*  If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief.  *Id.* at 176, 179.  The Court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief.  *Id.* at 179.

> **B.**     **The "Extraordinary Circumstances Standard" for Bail**

The parties agree that the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) establishes that "extraordinary circumstances" are required before "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition."  *Id.* at 367.  Citing *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), the Third Circuit in *Lucas* noted that extraordinary circumstances may be established where the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill.  *Id.* at 366-67.  The panel, however, did not expressly limit the finding of extraordinary circumstances to situations involving a petitioner's poor health.  *Id.* at 367.  Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy.  *See Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).  Recent decisions, including a decision by this Court, have applied this standard to determine whether extraordinary circumstances exist in the context of the COVID-19

pandemic to grant bail to immigration habeas petitioners.  *See, e.g., Cristian A.R. v. Decker*, Civ.

Act. No. 20-3600 (D.N.J. Apr. 12, 2020); *Rafael L.O.*, 2020 WL 1808843, at *5 (D.N.J. Apr. 9,

2020).

## III.   DISCUSSION

The Court finds that Petitioner has met the standard for a preliminary injunction and has

likewise met the extraordinary circumstances standard for granting bail in a habeas matter.

### A.   Preliminary Injunction

#### 1.   Likelihood of Success on the Merits

##### i.   Procedural Due Process Claim Regarding Prolonged Detention

The Government argues that Petitioner is unlikely to succeed on the merits of his habeas

claim of prolonged detention because he is statutorily ineligible for release and there have not

been any unreasonable delays in his removal proceedings. ECF No. 9, Answer at 8. The

Government further argues that Petitioner's over 18-month long detention is consistent with the

purposes of § 1226(c), to secure his presence for removal and prevent danger to the community

pending removal proceedings, and thus, Petitioner cannot demonstrate a substantial likelihood of

prevailing on his habeas petition or a deprivation of due process rights under the Fifth and

Fourteenth Amendments to the United States Constitution.  *Id.*

In *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018), the Supreme Court reversed the Ninth

Circuit holding that three detention provisions of the INA—8 U.S.C. §§ 1225(b), 1226(a), and

1226(c)—did not authorize prolonged detention without a bond hearing.  Applying the canon of

constitutional avoidance, the Ninth Circuit had construed these three provisions to require an

automatic bond hearing before the immigration judge ("IJ") at six months of detention. *See*

*Rodriguez v. Robbins*, 804 F.3d 1060, 1078-85 (9th Cir. 2015). The Court rejected the lower

court's "implausible constructions" of the three detention statutes, and remanded for the Ninth Circuit to decide in the first instance whether due process requires a bond hearing with the burden on the government when detention under the three provisions becomes prolonged. *Id.* at 842-47, 851. As such, the Court in *Jennings* expressly declined to consider the issue of whether unreasonably prolonged or indefinite detention under § 1226(c) comports with constitutional due process requirements. *See Lopez v. Sessions*, No. 18-4189, 2018 WL 2932726, at *13 (S.D.N.Y. Jun. 12, 2018) ("The Court did not reach the merits of the constitutional challenge before it, instead holding that there was no statutorily-guaranteed right to 'periodic bond hearings' under Sections 1225(b) and 1226(c).").  Post-*Jennings*, a petitioner may still bring an as-applied challenge to his prolonged detention. *See Dryden*, 321 F. Supp.3d  496, 501 (D.N.J. 2018) (finding that as-applied challenges remain viable post-*Jennings*).

*Jennings* abrogated the Third Circuit's holdings in *Diop v. ICE/Homeland Sec.* 656 F.3d 221, 231 (3d Cir. 2011) and *Chavez–Alvarez v. Warden York County Prison*, 783 F.3d 469 (3d Cir. 2015) to the extent those decisions rely on constitutional avoidance and read an implicit limitation of reasonableness into § 1226(c).  District courts, however, have found "[t]he constitutional reasoning that underlay the Third Circuit's invocation of the constitutional avoidance canon still provides some persuasive guidance to how this Court should address § 1226(c) claims"  *See Dryden*, 321 F. Supp.3d at 502; *see also Borbot v. Warden Hudson County Correctional Facility*, 906 F.3d 274, 278 (3d Cir. 2018) ("*Jennings* did not call into question our constitutional holding in *Diop* that detention under § 1226(c) may violate due process if unreasonably long.").

Indeed, Respondents recognize that courts in this District have found that detention lasting beyond one year under §1226(c), without an individualized bond hearing, violates due process. *See De Oliveira Viegas v. Green*, 370 F. Supp. 3d 443, 448-49 (D.N.J. 2019) (15 months) (citing

*Thomas C. A. v Green*, No. 18-1004, 2018 WL 4110941, at *5-6 (D.N.J. Aug. 29, 2018) (15 months) and *K. A. v. Green*, No. 18-3436, 2018 WL 3742631, at *4 (D.N.J. Aug. 7, 2018) (19 months)).

Here, ICE has detained Petitioner for 560 days without bond, well beyond the outer one-year limit established in *Chavez-Alvarez*. *See* 783 F.3d at 478 (holding that "beginning sometime after the six-month timeframe [upheld by the Supreme Court in *Demore v. Kim*, 538 U.S. 510, 532–33 (2003),] and certainly by the time [the petitioner] had been detained for one year, the burdens to [the petitioner's] liberties [will outweigh] any justification for using presumptions to detain him without bond to further the goals of the statute."). There is no evidence before the Court that Petitioner is gaming the system or otherwise trying to delay the adjudication of his appeal before the BIA.[24] Indeed, Petitioner's BIA brief asserts numerous substantive errors in the immigration judge's decision, such as the procedurally defective and legally incorrect determination of competency, *see* BIA Br. at 8-15; flawed analysis of Petitioner's eligibility for asylum and withholding of removal in contravention of BIA and Third Circuit precedent, *id.* at 15-21; and factual and legal errors in determining the likelihood that Petitioner would suffer persecution and torture if he were deported, *id.* at 21-44. 27. Thus, because Petitioner has been detained beyond the one-year outer limit established in *Chavez-Alvarez* and because there is no evidence of Petitioner's bad faith in challenging his removal, the Court finds that Petitioner has a high likelihood of success on his procedural due process claim that his detention is overly prolonged and violates his right to procedural due process.

_____

[24] On the issue of bad faith, *Chavez-Alvarez* acknowledged that "[a]n argument could be made that aliens who are merely gaming the system to delay their removal should not be rewarded with a bond hearing that they would not otherwise get under the statute." 783 F.3d at 476. Because the court concluded that Chavez–Alvarez did not act in bad faith in challenging his removal, it declined to decide whether a detainee's delay tactics should preclude a bond hearing. *Id.* at 476.

ii.     **Substantive Due Process Claim that Detention Amounts to Punishment**

Petitioner also argues that his continued detention during the COVID-19 pandemic amounts to punishment under the Fifth and Fourteenth Amendments in light of his deteriorating mental health, his heightened likelihood of contracting the COVID-19 at ECCF, and his heightened vulnerability to complications and a poor outcome if he contracts the virus. Respondents maintain that the conditions at ECCF do not amount to punishment, particularly in light of the Facility's measures to curtail the spread of COVID-19. Answer at 27-28. The Court disagrees with Respondents.

Recent decisions in this District have established the legal backdrop governing conditions of confinement claims brought by civil detainees. *See, e.g.*, *Cristian A.R.*, No. 20-3600; *Rafael L.O.*, 2020 WL 1808843. Civil detainees are entitled to due process and may bring conditions of confinement claims under the Due Process Clause of the Fifth (or Fourteenth) Amendment as opposed to the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979); *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019). The Fifth and Fourteenth Amendments protect civil detainees like Petitioner from *any*—not just "cruel and unusual"—punishment. *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005).

To determine whether Petitioner's conditions of confinement constitute punishment, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective, and if they are not, it may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" *Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). A condition or deprivation amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may

rationally be connected is assignable for it"; *or* the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).  The Court considers "the totality of the circumstances within an institution" to determine whether given conditions constitute punishment. *Hubbard*, 399 F.3d at 160 (internal quotation marks and citation omitted).  Civil detainees, like inmates, may be entitled to relief if they prove threats to personal safety from exposure to serious contagious diseases. *See Cristian A.R.*, No. 20-3600, slip. op. at 19 (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

In *Rafael L.O.*, Judge Vasquez found that the same conditions of confinement at ECCF, including the volume of ECCF detainees confined to inherently limited living and sleeping quarters, limited access to hygiene products, shared bathroom facilities, and the transmission of COVID-19 to detainees in custody, amounted to punishment of petitioners who had underlying medical conditions that made them vulnerable to serious complications or death if they contract the virus. 2020 WL 1808843, at *7-8.  Judge Vasquez further determined that "[t]he Respondents [did not] have an express intent to punish Petitioners" but found "that such intent is not a necessary prerequisite" to a claim under *Bell*.  *Id.* at *7.

Like the petitioners in *Rafael L.O.*, Petitioner's experience at ECCF demonstrates "obvious gaps" in the Facility's efforts to curtail the spread of COVID-19 to vulnerable detainees like Petitioner.  Petitioner shares a small room with another detainee, who recently became ill and had been taken into quarantine. Wyss Decl. ¶¶ 7-8.  To protect himself from his cellmate's coughing, Petitioner drew a blanket over his head.  *Id.* ¶ 6.  It is unclear from the record what measures, if any, ECCF took to ensure that Petitioner's dorm was properly cleaned after his cellmate began quarantine, or to further protect Petitioner or other detainees in his pod from possible

transmission.[25]  Respondents cannot dispute that by virtue of ECCF's dormitory design, most, if not all, detainees are being exposed to potentially contaminated persons and surfaces and use common areas and objects in-between cleanings.

ECCF's dormitory-style pods make true social distancing impossible, as conceded by the ECCF Medical Director, Dr. Anicette.  *See* Ex. B, Rodriguez Decl. ¶ 9.  In addition to the small cell Petitioner shared with an infected cellmate, he also shares a bathroom, which has only four showers, recreation space, and commonly used items like telephones with up to forty-eight other detainees in his pod, a mere eighteen inches apart.  Wyss Decl. ¶¶ 7-8; Kaplan Decl. ¶ 5; *see* Ortiz Decl. ¶ 5.  Petitioner claims that all detainees in his pod are together in the common space when they are permitted outside of their cells.  See Wyss Decl. ¶ 7-8.  Respondents also do not state whether the Facility cleans and sanitizes the common area and frequently-touched common items before and after detainees are permitted outside of their pods.  And, while they state that ECCF has implemented social distancing policies, Respondents do not provide how ECCF ensures those policies are enforced.

Should Petitioner require quarantine, he is likely to be placed in a cell where detainees are reportedly denied access to water, soap, and telephones.  *See* Kaplan Decl. ¶ 5; *see also* Hartmann Decl. ¶ 6; Weiner Decl. ¶ 7.  Quarantined individuals are permitted to leave their cells for one hour each day, where they can shower and make telephone calls.  Weiner Decl. ¶ 8; Rodriguez Decl. ¶ 6.  While Respondents indicate that they have established a quarantine area, it is not clear whether quarantined individuals use the same showers and telephones as non-quarantined persons.

To make matters worse, there has been a significant growth in confirmed or suspected cases among staff at ECCF since Petitioner filed this case and the parties briefed the instant motion, *see*

---

[25] Respondents assert that Petitioner does not allege that his cellmate tested positive for COVID-19, Answer at 13, but do not appear to dispute that Petitioner's cellmate was quarantined after becoming ill.

*supra* at 14, and ECCF's protocols appear to confirm that it has not been testing  asymptomatic detainees, even those with a known exposure to someone with COVID-19 despite asymptomatic and pre-symptomatic individuals' ability to spread the virus.  *See* Ortiz Decl. ¶¶ 19-20.   Thus, while the Court credits ECCF's increased cleaning and social distancing measures, Respondents have certainly left open and unchallenged significant shortcomings in ECCF's efforts to curtail the spread of COVID-19.

One difference between Petitioner's case and those of the petitioners in *Cristian A.R.* and *Rafael L.O.* is that Petitioner suffers from mental illness rather than physiological conditions. Respondents contend that this difference, along with Petitioner's age and failure to show he has been exposed to the virus, mitigate against his release.  <u>See</u> Answer at 13.  Based on the totality of the circumstances here, the Court disagrees.

At least one court in this District has ordered the release of a detainee with serious mental illness, finding that the detainee's detention amounts to punishment under the circumstances presented.  In *Durel B. v. Decker*, Judge McNulty granted a temporary restraining order, requiring immediate release, for a mentally ill, 23-year-old petitioner detained in immigration custody at the Hudson County Correctional Facility in Kearny, New Jersey.  *See* No. 20-3430, 2020 WL 1922140 (D.N.J. Apr. 21, 2020).   Similar to Petitioner here, petitioner in *Durel B.* suffered from posttraumatic stress disorder and a schizophrenia-spectrum disorder. The petitioner alleged that the antipsychotic medication he takes for his medical conditions is "associated with decreased immunity" and cited articles which indicate that antipsychotic medications have been linked with suppressing an individual's immune system, making it more difficult for their bodies to fight off infection.  *Id.* at *5.  The petitioner also cited an article suggesting that individuals who suffer from severe mental illness such as schizophrenia are more likely to suffer complications from

respiratory diseases and submitted an expert declaration which states that individuals with severe and persistent mental illness ("SPMI") are significantly impacted by pandemics. *Id.*

In considering these arguments, Judge McNulty found that the petitioner faced an higher risk of serious complications of COVID-19 such that his confinement constituted unlawful punishment and justified temporary restraints and interim release under *Lucas*. *Id.* The Court noted that "[t]his decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case." *Id.* at *1; *see also Doe v. Barr*, No. 20-2263, 2020 WL 1984266, at *6 (N.D. Cal. Apr. 27, 2020) (finding that detention of detainee with severe posttraumatic stress disorder and major depressive disorder with psychotic features amounted to punishment).

Like the petitioner in *Durel B.*, Jose suffers from a schizophrenia-spectrum disorder, *see* Petition ¶ 28, and has also presented evidence that he, as a person living with schizophrenia, is more susceptible than the general population to infections and is at higher risk of serious complications and a poor outcome were he to contract COVID-19. *See supra* at 7-8. Furthermore, after evaluating him in February 2020, Dr. Choi determined that his symptoms had significantly worsened from the prior year, explaining that persons with schizophrenia are prone to exacerbation under stress, *see* Ex. B at ¶ 33, and stating that she "strongly suspect[ed] that being detained is contributing to worsening of his symptoms," *id.* Such stress is likely exacerbated by the present conditions at ECCF, where COVID-19 is present, and Respondents have not demonstrated the Facility has implemented and enforced sufficient measures to curtail its spread. It would only be further exacerbated should Petitioner either contract COVID-19 or be forced to experience the bleak quarantine conditions at ECCF, like those described in the Kaplan, Hartmann, Weiner, and Rodriguez Declarations. *See supra* at 15.

For all these reasons, the Court is satisfied that Petitioner has demonstrated that his conditions of confinement in light of his vulnerabilities amount to punishment under the Due Process Clause.[26]

### 2.    Irreparable Harm

To be entitled to a preliminary injunction, a movant must also establish that he or she is "more likely than not" to suffer irreparable harm absent the requested relief.  *See Reilly*, 858 F.3d at 179.  Respondents argue that Petitioner cannot meet the irreparable harm requirement because his likelihood of contracting COVID-19 is speculative in light of the precautions ECCF and because his injury is not redressable by release.[27]  *See* Answer at 32-37.

The Court disagrees that Petitioner's likelihood of contracting COVID-19 is speculative for the reasons already highlighted above.  As the Supreme Court observed in *Helling*, "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  509 U.S. at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").

As Judge Vazquez found in *Rafael L.O.*, "with the conditions as currently described, at-risk detainees – including Petitioners – cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene, that have been touted as the most effective means to thwart

---

[26] Petitioner also alleges that his detention constitutes unlawful discrimination on the basis of his disability for mental illness, in violation of Section 504 of the Rehabilitation Act.  The Court agrees with Respondent that this claim is not cognizable in habeas but need not reach it in light of the Court's finding that Petitioner has a likelihood of success on his constitutional claims.

[27] Respondents also cite to *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir.1994) (reversing grant of preliminary injunction compelling county to issue a building permit because plaintiff would not suffer irreparable harm by delaying building and injunction did not maintain the status quo) for the proposition that "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity."  *Id.* at 653.  Here, Petitioner has met this burden by providing evidence of his deteriorating mental health and his increased susceptibility to complications and a poor outcome should he contract COVID-19.

the spread of the virus.  Against this backdrop, Petitioners have demonstrated irreparable harm should they remain in confinement."  2020 WL 1808843, at *8; *see also Thakker*, 2020 WL 1671563 at *7 ("[C]atastrophic results may ensue, both to Petitioners and to the communities surrounding the Facilities."); *Hope v. Doll*, No. 20-562 (M.D. Pa. Apr. 7, 2020) ("We cannot allow the Petitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction.").

### 3.    Balancing of the Equities

"Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merch Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted).  Here, the Court finds the potential of injury to Petitioner is high for the reasons set forth above.  Notably, the public interest also supports the release of Petitioner before he contracts COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems.  *See Rafael L.O.*, 2020 WL 1808843, at *9.

Respondents also have a legitimate interest in ensuring that Petitioner does not flee and in protecting the public.  As Judge Vasquez found in *Rafael L.O.* and this Court recently found in *Cristian A.R.*, those very important interests are adequately addressed by fashioning appropriate conditions of release.  *See Cristian A.R.*, No. 20-3600, slip. op. at 27.  Petitioner has 2017 convictions under N.J. Stat. § 2C:18-2A(1), for burglary in the third degree, and under § 2C:20-3A, for theft by unlawful taking in the third degree.  This history involves nonviolent offenses, and Petitioner has significant ties to this country such that he can be safely released on reasonable conditions of supervision.  The Court is also satisfied that there are reasonable conditions that can

ensure the Petitioner's appearance for future immigration proceedings and ensure treatment for his mental illness.  The specific conditions of release are set forth in the Order accompanying this Opinion.

### B.      Extraordinary Circumstances Justify Releasing Petitioner from Detention

Finally, Petitioner in this matter has shown that ECCF is at the epicenter of the outbreak where he cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene to stop the spread of the virus due to the conditions at ECCF and his worsening mental illness.  These facts warrant the extraordinary remedy of release on bail, and make bail necessary, to make the habeas remedy effective.  *See Landano*, 970 F.2d at 1239.

The Government contends that if the Court were to determine that detention has become unconstitutionally prolonged, the proper relief would be to order the immigration court to conduct an individualized bond hearing.  Answer at 8.  In *Cristian A.R.*, this Court expressly noted the recent chaos at the Varick Street Immigration Court in New York caused by the COVID-19 pandemic, which has resulted in delayed bond proceedings, lack of access to counsel, and the closure of bond offices in New York and New Jersey.  *See* No. 20-3600, slip. op. at 28-29.

Based on the Declaration of Petitioner's immigration counsel, the Elizabeth Immigration Court has been similarly impacted by sporadic delays and closures.  *See* Wyss Decl. ¶¶ 10-16.  Such inconsistencies in immigration court hearings have impacted detainees' ability to receive meaningful bond hearings and to confer with counsel to prepare a fulsome bond packages.  *See id.* ¶ 4.  Here, even if the Court considered ordering a bond hearing, it is unclear whether Petitioner would be able to meaningfully confer with his counsel before that hearing took place.  It is also unclear whether the immigration judge assigned to his matter would have time to thoroughly review his package.  *See id.*  The Court thus also finds that Petitioner's potential inability to have

a meaningful and timely hearing, an opportunity to confer with counsel, and time to prepare a bond package are extraordinary circumstances weighing in favor of his release under appropriate conditions. *See Cristian A.R.*, slip. op. at 28-29.

## IV.   CONCLUSION

For the foregoing reasons, Petitioner's Emergency Motion for a Preliminary Injunction, ECF No. 12, is **GRANTED**, and the Court orders Petitioner's immediate release subject to the conditions as ordered.  An appropriate Order accompanies this Opinion.


Dated:  May 27, 2020                         */s Madeline Cox Arleo*
                                             **Hon. Madeline Cox Arleo**
                                             **UNITED STATES DISTRICT JUDGE**